IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE

APRIL 1998 SESSION

FILED

July 30, 1998

Cecil W. Crowson
Appellate Court Clerk

§

STATE OF TENNESSEE ,
  APPELLEE

§

VS.          C.C.A. No. 01C01-9706-CC-00234

§  MARSHALL COUNTY
           HONORABLE CHARLES LEE

LESA MAE MALONE  §
  APPELLANT     (SENTENCING)


FOR THE APPELLANT    FOR THE APPELLEE

Robert H. Plummer, Jr.    John Knox Walkup
415 Bridge Street     Attorney General and Reporter
P. O. Box 1361      425 Fifth Avenue, North
Franklin, TN  37065-1361   Nashville, TN  37243

          Karen M. Yacuzzo
          Assistant Attorney General
          425 Fifth Avenue, North
          Nashville, TN  37243

          W. Michael McCown
          District Attorney General
          Marshall County Courthouse
          Lewisburg, TN  37091

          Weakley E. Barnard
          Assistant District Attorney General
          Marshall County Courthouse
          Lewisburg, TN  37091


OPINION FILED: _____


AFFIRMED

L. T. LAFFERTY, SPECIAL JUDGE
     **OPINION**

The defendant, Lesa Mae Malone, appeals as of right from the length and manner of service of a sentence imposed by the Marshall County Circuit Court for theft of over $60,000, a Class B felony. She received a sentence of ten (10) years in the Department of Correction. The defendant complains the trial court: (1) improperly denied the alternative sentencing of community corrections, (2) improperly used the defendant's pretrial diversion from 1984 as a conviction and also an element of the crime to enhance the punishment, and (3) improperly used the concept of deterrence when there was no evidence to that effect in the record. After a review of the evidence in this record, the briefs of the parties, and the applicable law, we affirm the trial court's judgment.

## FACTS

The Marshall County grand jury indicted the defendant in indictment # 12990, involving 356 counts of forgery and in count 357, theft of property over $60,000. The offenses occurred between October, 1993 through January, 1996. On December 11, 1996, the defendant entered a plea of guilty to count 357, theft of property over the value of $60,000. The other 356 counts of forgery were dismissed. The trial court set a hearing for February 5, 1997, to determine the length of the sentence and the manner of service. The State alleges in alternative counts (356) of forgery and uttering that the defendant intended to defraud or harm the Marshall Medical Center of Lewisburg, Tennessee and Nationsbank of Tennessee. In count 357, the State alleges that the defendant, between October 15, 1993, and January 19, 1996, committed the offense of theft of property from the Lewisburg Community Hospital DBA Marshall Medical Center in the amount of One Hundred Twenty-Five Thousand Nine Hundred Nine Dollars and eighty cents, ($125,909.80).

At the entry of the open plea of guilty, the State submitted a stipulated statement of facts as to how the defendant committed these various offenses. The State believed it could prove the defendant, while an employee in the payroll department of the Lewisburg Community Hospital, forged certain employees' cards and time sheets by cutting checks for certain amounts and forging the employees' names and cashing the same at a bank. A copy of the presentence report, introduced in the sentencing hearing (and in the record) describes the defendant's criminal activities as being achieved by the defendant submitting false time sheets for alleged overtime hours on various employees in the nursing department to payroll and having additional checks issued. The defendant would then forge the employees' names onto the checks, co-sign the checks, and cash them at a local bank. Twenty-nine (29) employees were the victims of this scheme. Upon being confronted by the hospital administrators, the defendant admitted to committing these offenses. Also, the defendant confessed to the Lewisburg Police as to how she committed these offenses.

In the presentence report, the defendant offered her version of the events:

> "I began approximately in 1994 falsifying time sheets and having make-up checks written on other employees, then I would cash them for myself. I was having problems getting my child support and I used the money for myself and to take care of my children. It became regular to do until I was terminated. I realize what I did was very wrong and dishonest. I was trying to take care of my children, but I did live beyond my means. I would like the chance to pay back the money if it takes the rest of my life. I am very sorry for what I did."

## SENTENCING HEARING

In her request for a minimum sentence and alternative sentencing, the defendant offered the testimony of six witnesses, including herself. At the commencement of the hearing a disagreement arose between the State and the defendant about an arrest for embezzlement in 1984. The record establishes that the defendant had been arrested in 1984 for forgery in six (6) counts in which she

forged checks of her employer, Dr. Beech, in the amount of $1,900. Apparently, the defendant was placed on pretrial diversion, restitution made and the charges dismissed and expunged. The trial court believed there was a question of this arrest being relevant in the absence of a conviction, but may have become relevant on the question of deterrence as to the defendant.

Mrs. Cathy Darnell, older sister of the defendant, advised the trial court that the defendant has a very good relationship with her two daughters, ages eleven (11) and thirteen (13). Mrs. Darnell described her sister as trying too hard to provide for her children and wanting to give them the best of everything. Mrs. Darnell believed her sister had suffered so much and had learned her lesson. Mrs. Darnell admitted she did not ask the defendant what she had did with the $125,909.00, nor had the defendant volunteered any information. The witness saw no evidence of extravagant living on her sister's part. However, the witness was aware that her sister lived on a farm in a medium price home, drove an Explorer, and had bought two horses for family recreation and showing. Mrs. Darnell agreed the purchases and upkeep of these horses were expensive. Mrs. Darnell was aware of her sister's arrest in 1984 and talked to her about the event at the time. The witness informed the trial court that the defendant's first husband more or less abandoned the defendant by entering the military service and leaving the defendant with two babies. An interesting aspect of Mrs. Darnell's testimony revealed that she and the defendant had agreed to offer approximately $40,000 for a Merle Norman cosmetic franchise, in Pulaski, Tennessee in October, 1996. The defendant was to pay $20,000 for her share of the franchise or be at least responsible for her share.

Ms. Virginia Stuart and Ms. Jamie Ellis, co-employees of the defendant while at the Lewisburg Community Hospital, advised the trial court that they had the occasion to observe the defendant advance from a switchboard operator to

4

secretary of the Director of Nursing. They both left the hospital in 1993 and would see the defendant on a social basis, either in her home or at horse shows. Both witnesses characterized the defendant's relationship with her children as very loving. Both witnesses did not observe any extravagant living on the defendant's part. Both witnesses expressed surprise at the hearing in learning the defendant had been arrested in 1984 for a similar offense, but, being friends with the defendant, concluded that the episode in 1984 would not change their minds concerning the defendant.

Mr. Roger Malone, the defendant's husband, testified he and the defendant married a couple of years before the hearing. His wife was employed at the hospital as a secretary and he did not know her salary. Mr. Malone was aware of his wife's problems with her ex-husband and his refusal to pay child support. Also, Mr. Malone was aware of the defendant's past arrest and understood restitution had been made. Mr. Malone is a vinyl siding installer, who owns and paid for his sixty-one (61) acre farm, which contained a medium three bedroom home. Mr. Malone estimated his income at about $50,000 to $60,000 in a good year. Mr. Malone advised the trial court that the defendant's two children attended public schools. As to the offense, Mr. Malone learned about the charges two months after the defendant had been released from the hospital. The defendant had hidden this matter from her husband. Mr. Malone stated his reaction as follows:

> "I was very upset, very hurt. I worked hard all of my life and tried to make every dollar that I could to pay my own bills, and it really hurt me".

The defendant never satisfactorily explained to her husband why she did it. When asked where the $125,909.80 went, the witness responded:

> "I can't tell you. I have asked her a hundred times, and she can't tell me. If she had gone out and bought a $50,000 vehicle or a $50,000 horse or $25,000 diamond ring, I could understand where part of it went. I lived with her during this time. I couldn't explain to you where that kind of money went".

Mr. Malone confirmed that the defendant purchased two spotted geldings for about $3,300, leased an Explorer in her own name, and paid for some lawn shrubbery for the home. Although the defendant works, Mr. Malone, as to restitution, stated: "I don't see any way she can make full restitution."

Mr. Joe "Buck" Beard, a very close friend of the defendant's husband, advised the trial court of his observations of the defendant over several years. Mr. Beard was a former deputy with the Lewis County Sheriff's Department and a former member of the Lewisburg Police Department. Since 1993, Mr. Beard had seen the defendant at horse shows, mainly on weekends. He asked the defendant what she did with the money, to which she replied she didn't know. Mr. Beard testified that the defendant did not live an extravagant lifestyle and that possibly some of the money went for horses and training. Mr. Beard became aware of the defendant's past offense two weeks prior to the hearing.

The defendant was married at age seventeen (17) and two children were quickly born. The defendant and her husband separated in 1985. He joined the military service leaving her with a thirteen (13) month old and a five (5) month old. She received some child support while her husband was in the service, but this ended when he returned. Since the defendant's divorce, she has worked at various jobs. At the sentencing hearing the defendant was working two jobs, one at Brindley Construction Company and one at a convenience store on the weekends. She estimates her income at $300 every two weeks.

At the first of February, 1996, the defendant was confronted by an administrator of the hospital concerning the payroll checks. The defendant admitted what she had done and took sole blame for these offenses, including a statement of admission. The defendant described how she committed these offenses:

"Q. --how did you decide to start doing this?

A.  I remember someone needing a makeup check done--

Q.  What is a makeup check?

A.  A makeup check is a --was a check that was written that was produced that wasn't actually pulled off of the payroll sheet.  If an error had been made, if they didn't clock in or clock out or if someone failed to pay them educational pay or whatever the pay was, a makeup check was issued.--I never planned on doing it. It just happened.

*******

Q.  So within three to four months of being placed in this new position, you started stealing; is that correct?

A.  Yes, sir.

Q.  That stealing continued until you got caught?

A.  Yes, sir."

The defendant submitted to the trial court a summary of where she believes the money went and for what.  The defendant accounted for approximately $71,000 in this twenty-seven (27) month period of theft, ranging from the purchase of a horse ($3,500), an Explorer ($10,000), Wal-Mart ($9,000), utilities, and a cellular phone ($2,500).  The total did not count child care, clothes or cash spent. The defendant admitted she had the love of her husband, a home, food, clothing and the care of her children.  Why then did the defendant commit this theft?

"Q.  What you are saying is:  You spent money on your family, but that was to bring them up to the lifestyle that you wanted?

A.  Right.

Q.  It wasn't necessities; it was lifestyle?

A.  Yes sir, you are right."

7

The defendant further admitted that in 1984 she had stolen $1,900.00 from her employer, Dr. James Beech. The defendant was granted pretrial diversion. The defendant admitted advising the court she would never do anything like this again.

After an eloquent and passionate plea for an eight (8) year sentence and probation based on the requirement of restitution in behalf of the defendant, the trial court sentenced the defendant to a mid-range sentence of ten (10) years in the Department of Correction.

## MANNER OF SERVICE OF SENTENCE

We will first review the defendant's complaint that the trial court improperly denied an alternative sentence, to-wit; community corrections. Our review of the manner of service of a sentence is *de novo* upon the record with the presumption that the trial court's determination is correct. Tenn. Code Ann. § 40-35-401 (d). Such a review requires us to consider the evidence presented at the guilty plea and sentencing hearing, the pre-sentence report, the principles and purposes of sentencing, the argument of counsel, the nature and characteristics of the offense, the existing mitigating and enhancing factors, the statement of the defendant, and the potential for rehabilitation. Tenn. Code Ann. § 40-35-102, -103, -210; *State v. Moss,* 727 S.W.2d 229 (Tenn. 1986); *State v. Taylor,* 744 S.W.2d 919 (Tenn. Crim. App. 1987).

The defendant argues that to place her in the community corrections program, in lieu of incarceration, is best for her rehabilitation. Since the defendant is not a violent nor an habitual criminal, she can be rehabilitated in such program and counseling. Further, the defendant contends she should not be denied community corrections placement due to her prior bad act at the age of nineteen (19), as that offense occurred nine (9) years prior to the current offense. Since her arrest, the defendant has sought counseling, which has had a positive effect on her life and outlook. Her motive in committing the present offense was to be sure her

family stayed with her. She acknowledges her actions were wrong and she recognizes they were wrong.

In response, the State contends the trial court was correct in ordering the defendant to serve a mid-range sentence and in ordering the defendant to serve her sentence in confinement.

Further, the State contends that the trial court was correct in applying certain enhancing factors to raise the defendant's sentence from the minimum of eight (8) years to ten (10) years, six (6) months and by applying one mitigating factor to reduce the sentence to ten (10) years. Also, the trial court was correct in denying an alternative sentence to the defendant in the form of community corrections.

At the conclusion of the hearing, the trial court set out its rulings as to the proper sentence and denial of an alternative sentence. The trial court found four factors applicable to the sentencing procedure. In mitigation the trial court found the defendant's criminal conduct neither caused nor threatened serious bodily injury. Tenn. Code Ann. § 40-35-113 (1). In enhancement the trial court found three (3) factors: the defendant has a previous history of criminal behavior in addition to those necessary to establish the appropriate range, Tenn. Code Ann. § 40-35-114(1); the offense involve more than one victim, Tenn. Code Ann. § 40-35-114(3); and, the defendant abused a position of private trust, or used a special skill in a manner that significantly facilitated the commission or the fulfillment of the offense, Tenn. Code Ann. § 40-35-114 (15).

The trial court in applying enhancement factor (1)--history of criminal behavior--was impressed the defendant began committing these offenses six years after completing diversion in 1987. Also, the trial court stated,

> "The Court does find that enhancing factor (1) and does place significance on the fact that we are dealing with virtually the same type of offense, even though committed in different ways. By that, I mean different schemes."

As to enhancement factor (3)--more than one victim--the trial court found this factor applicable because of the unique facts in the case and the unique methodology employed by the defendant to accomplish the crime. The presentence report contained a victim impact statement from the Marshall Medical Center outlining the effect of these forged checks on various employees in dealing with the IRS. The trial court gave this factor less weight than the others.

The trial court placed great weight on enhancement factor (15)--a violation of private trust and special skill in assessing the proper sentence,

> "The court notes with interest that on the expenditures which were had during this time, the defendant spent some money to go to some accounting school and take some accounting courses while she was using those skills to, apparently, purloin funds from her employer. So that would be a special skill in addition to the violation of trust."

The defendant must establish the burden of showing that the length or manner of service of the sentence imposed is improper. Tenn. Code Ann. § 40-35-401(d). Sentencing Commission Comments. However, the presumption of correctness attached to the trial court's determination is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances. *State v Ashby,* 823 S.W.2d 166 (Tenn. 1991). Persons who are especially mitigated or standard offenders convicted of Class C, D or E felonies are presumed to be favorable candidates for alternative sentencing options in the absence of evidence to the contrary. Tenn. Code Ann. § 40-35-102 (5). Since the defendant has plead guilty to theft over the value of $60,000, as a standard offender, a Class B felony, the defendant is not entitled to the presumption of a favorable candidate for an alternative sentence.

We believe there is ample evidence in the record to support the trial court's determination that the defendant's ten (10) year sentence is proper. The defendant complains that the offense of 1984 should have little weight in determining an

enhancement of the sentence and it was error to consider this offense in enhancing the defendant's sentence. We agree with the trial court's assessment that the defendant's actions in 1984 and the present offense are very significant. In 1984, the defendant stole $1,900 from her employer and, due to the benevolence of our criminal justice system, had the benefit of pretrial diversion and no criminal record. The nature of these offenses are too similar for a trial court to overlook. Enhancement factor (1) was properly considered by the trial court. *State v. William Jeffrey Carico,* ___ S.W.2d ___ (Tenn. 1998). There is no merit to this complaint.

Second, the defendant complains the trial court improperly found enhancement factor (3)--more than one victim--applicable. The defendant argues this assessment is akin to stating an assault or robbery has more than one (1) victim because the families of the victims suffer as a direct result of the actions. A review of the presentence report establishes the defendant defrauded twenty-nine (29) separate co-employees, as well as the hospital, in forging these "make up" checks. When these various employees attempted to correct their respective financial conditions, especially with the IRS, that would be one mean task. Although the trial court did not give this factor great weight, the overall effect on these various employees of these forgeries was substantial. The trial court properly concluded that there was more than one victim in this case, thereby justifying the use of enhancement factor (3). The defendant's second complaint is without merit.

Third, the defendant complains the trial improperly found enhancement factor (15)--trust or use of special skill--applicable. The defendant points out trust was certainly involved, but there was no proof of a special skill being involved. However, the trial court, in assessing the facts as to exactly how the defendant accomplished these thefts, believed she utilized her accounting classes to further

her scheme. We find ample evidence in this record that the trial court did properly find this enhancement applicable to this defendant. There is no merit to this complaint.

Although, the defendant contends the trial court should have given greater weight to the mitigating factor (1) to impose a sentence of eight (8) years, we find the trial court correctly balanced the weight for each factor in arriving at a ten (10) year sentence. The trial court's judgment is affirmed.

### Denial of
### Community Corrections Program

The defendant strongly contends she meets the requirements for sentencing into the community corrections program in order to rehabilitate her. Tenn. Code Ann. § 40-36-106--Eligible Offenders, sets out minimum criteria for persons applying for alternative sentences. The defendant submits she falls within the criteria of:

(2) Persons who are convicted of property-related, or drug/alcohol-related felony offenses or other felony offenses not involving crimes against the person as provided in title 39, chapter 13, parts 1-5;

(3) Persons who are convicted of nonviolent offenses;

(4) Persons who are convicted of felony offenses in the which the use or possession of a weapon was not involved;

(5) Persons who do not demonstrate a pattern of committing violent offenses;

More particularly;

(C) Felony offenders not otherwise eligible under subsection (a), and who would be usually considered unfit for probation due to histories of chronic alcohol, drug abuse, or mental health problems, but whose special needs are treatable and could be served best in the community rather than in a correctional institution, may be considered eligible for punishment in the community under the provisions of this chapter.

The defendant argues that if these offenses had been committed because of an alcohol or drug problem, it would be reasonable to assume she would receive community corrections, because her problem would be treatable. The defendant

concedes her actions do not rise to the level of mental health problems, but through her testimony and her counselor her problems are treatable. Through her testimony, the defendant verbalized her fears concerning her past marriage, her loss of her children, and her ultimate realization that her fears were misplaced. Her counselor, Susan Miller, a licensed counselor and therapist, believes the defendant can refrain from this type of activity and that supervised probation and therapy would benefit her. Thus, the defendant, through her misguided mental perceptions, is treatable in a community corrections system.

The trial court, upon finding the defendant ineligible for probation, began an analysis of the defendant's request for community corrections placement. The trial court found no limitations on the sentence for community corrections under Tenn. Code Ann. § 40-36-106(a). In denying the defendant's request for community corrections, the trial court was most concerned that the defendant utilized her position of trust to defraud her co-employees and the hospital, and with the large amount of money taken, $125,909.80. In referring to the sentencing principles of Tenn. Code Ann. § 40-35-102 (2) and (3), the trial court stated:

> "Mr. Plummer has done a very good job in arguing what the effect of the impact of confinement to this lady would be upon her and her family. But the Court has to sit in a position where it views not only the defendant and what would be best for the defendant, but it has to view the Court's decision on society as a whole.
>
> What message would we be sending to our society, the other people out there who are working in employment situations, young people, if we told them that you can steal from your employer, not once, and the second time you steal from your employer, you can steal $125,000 and you won't go to jail? I'm afraid that message has too often been sent to the young people of our society and our society in general. That is that which the Court has to consider is not only the impact upon this defendant but upon society as a whole.
>
> The Court does feel that the crime of this nature that the Court has no other alternative than to incarcerate the defendant for the crimes that she has committed."

A trial court is entitled to a presumption of correctness in determining a proper sentence if it correctly applied the principles of sentencing and its findings are supported by the evidence. *State v. Boggs,* 932 S.W.2d 467, (Tenn. Crim. App.. 1996). Although, the trial court did not comment on the sentencing principles of Tenn. Code Ann. § 40-35-103 (1), (B) the trial court did consider this subsection.

Tenn. Code Ann. § 40-35-103:

(1) Sentences involving confinement should be based on the following circumstances:

* * *

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses;

The sentence imposed should be no greater than that deserved for the offenses committed, and any inequities in sentencing should be avoided. The sentence imposed should be the least severe measure necessary to achieve the purposes of the Sentencing Act of 1989. A defendant's potential or lack of potential for rehabilitation or treatment should be considered in determining the sentencing alternative or length of term. Trial judges are encouraged to use alternatives to incarceration that include victim compensation, reparation, or community service. Tenn. Code Ann. § 40-35-103 (2), (3), (4), (5) and (6). Within this contemplation is the placement of an eligible candidate for community corrections.

In *State v. Cummings,* 868 S.W.2d 661, (Tenn. Crim. App. 1992), Judge Summers speaking for this court said about the role of the community corrections program:

"The Tennessee Community Corrections Act of 1985 was passed by the 1st Extraordinary Session of the 1985 General Assembly. The purposes of community corrections was to establish a policy to punish selected, non-violent felony offenders in front end community

based alternatives to incarceration. Because of prison overcrowding, community corrections was a way to reserve secure confinement facilities for violent felony offenders. As part of the goals of the Community Correction Act, the General Assembly established efficient community corrections programs; promoted accountability of offenders to their local community; filled gaps in the local correctional system through the development of a range of sanctions and services; reduced the number of non-violent felony offenders in correctional institutions and jail; and provided 'opportunities for offenders demonstrating special needs to receive services which enhance their ability to provide for their families and become contributing members of their community'. Tenn. Code Ann. § 40-36-104."

We agree that the defendant may be entitled to consideration of the benefits of a community corrections program, but was the defendant eligible pursuant to Tenn. Code Ann. § 40-36-106 (c)? The defendant must establish under subsection (C) she is *suitable* for placement in the community corrections program. The defendant must establish a history of chronic alcohol, drug abuse, or mental health problems; these factors were reasonably related to and contributed to the offender's criminal conduct; the identifiable special need (or needs) are treatable, and the treatment of the special need could be best served in the community rather than in a correctional institution. We believe the defendant's misguided mental perceptions do not meet these requirements.

Ordinarily, deterrence alone is not grounds for denial of community corrections. *State v. Ashby,* 823 S.W.2d 166, 170 (Tenn. 1991). Deterrence is certainly a principle to consider in sentencing, but both case law and statutes contemplate that consideration should be qualified. *State v. Ashby, supra; State v. Fletcher,* 805 S.W.2d 785, 787 (Tenn. Crim. App. 1991). However, general deterrence, as well as specific deterrence, may be sufficient based on the facts of a particular case. In *State v. Millsaps,* 920 S.W.2d 267, 271 (Tenn. Crim. App. 1995), Millsaps, a bookkeeper and employee for a furniture company, between 1988 and 1991 stole $80,220.19. The trial court denied probation on the ground of deterrence stating:

"I think confinement is necessary to avoid depreciating the seriousness of this offense because it involves an incredibly large amount of money."

In affirming the trial court's decision, Judge Hayes, speaking for this Court, stated:

> "However, in a case involving facts almost identical to those in the instant case, we observed:
>
>> "That the record supports the trial court's reasoning that if people with similar abilities and in similar positions to the defendant believed that they could commit offenses of a similar magnitude without having to be confined and without making real restitution, there would be a significant number of them who would yield to criminal temptation with impunity and little concern for the harm caused others---unquestionably, (the sentencing court) rightfully considered ---the need for effective deterrence to others likely to commit similar, serious offenses." *State v. Franks,* No. 03C01-9209-CR-00303 (Tenn. Crim. App.. at Knoxville, December 22, 1993).

From our analysis of the record, the defendant has not carried her burden in establishing that she should receive placement in the community corrections program in lieu of confinement. The trial court was correct in being concerned regarding the seriousness of these multiple offenses. The defendant's conduct continued over a twenty-seven (27) month period. She issued, forged, and cashed approximately six (6) checks a month. The amount of loss to the defendant's co-employees and her employer was an incredibly large amount of money. Was the defendant really serious about restitution? The defendant offered $10,000 front end restitution, but the evidence suggested she and her sister offered $40,000 for a cosmetic franchise in Pulaski, Tennessee. There is also evidence in this record the defendant attempted to dissuade a co-employee, Becky Clark, from disclosing the defendant's actions in regards to Clark's checks.

Another major hurdle the defendant attempted to overcome was the employer thefts of 1984. As to the defendant's motive in 1984, the defendant stole from her employer because she needed the money to support herself and her very young children. As previously stated, the defendant was granted pretrial diversion. In this offense the defendant was motivated to steal, also for her children, but not for necessities. The defendant wanted the good things of life, such as training horses, a

satellite dish, cable television, a cellular phone, nice clothes, a computer and a new Explorer.

We believe the trial court properly considered deterrence in assessing the sentence.

We hold that the factors in favor of incarceration outweigh the factors against, and the defendant has failed to establish that the trial court erred in denying any alternative sentence.  The trial court's judgment is affirmed.


_____

L. T. Lafferty, Special Judge

**CONCUR:**

_____
Gary R. Wade, Presiding Judge

_____
Thomas T. Woodall, Judge